### AMERICAN SUGAR REFINING CO. v. BIDWELL, Collector.

(Circuit Court, S. D. New York. August 7, 1903.)

No. 19,068.

1. CUSTOMS DUTIES—DATE OF IMPORTATION.
   An article is not imported from a foreign country, within the meaning of the tariff laws, until it actually arrives at a port of entry of the United States, and the importation is governed by the law in force at the time of such arrival.

2. SAME—GOODS ARRIVING FROM PHILIPPINES AFTER CESSION TO UNITED STATES.
   The effect of the treaty of Paris, by which Spain ceded the Philippine Islands to the United States, and which took effect by the exchange of ratifications, and by the President's proclamation on April 11, 1899, was to repeal the existing tariff duties, so far as related to goods brought from such islands; and goods arriving at a port of entry of the United States from Philippine ports after its taking effect were not subject to duty, although they were shipped prior to said April 11th.

On Demurrer to Complaint.

This is an action commenced in the Supreme Court of the state of New York, and removed to this court, brought by the plaintiff against the defendant, to recover the sum of $58,027.49, with interest thereon from the 11th day of October, 1899, and which sum, it is claimed was illegally exacted and collected from the plaintiff by George R. Bidwell, as collector of the port of New York, through duress of goods, etc., as duties upon certain sugars brought from the port of Iloilo, situated in the island of Panay, in the Philippine Islands. The defendant demurs to the complaint upon the grounds that the same does not state facts sufficient to constitute a cause of action against the defendant, and that at the date when the merchandise mentioned in the complaint was shipped the Philippine Islands was a foreign country, within the meaning of the tariff laws of the United States.

Parsons, Closson & McIlvaine, for plaintiff.

Henry L. Burnett, U. S. Atty., and Henry C. Platt, Asst. U. S. Atty., for defendant.

RAY, District Judge. At all the times mentioned in the complaint and now the plaintiff was and is a corporation organized and existing under the laws of the state of New Jersey, but duly carrying on and transacting a part of its business in the city and state of

¶ 1. See Customs Duties, vol. 15, Cent. Dig. § 7.

New York. The defendant at such times was the duly appointed, acting, and commissioned collector of customs of the United States of America at the port of New York, in the actual and unrestricted exercise of his functions as such, and was fully vested with all the powers and authority of his office. On the 14th day of March, 1899, the plaintiff caused to be shipped from the port of Iloilo, situated in the island of Panay, in the Philippine Islands, on the sailing vessel Strathern, 68,518 packages of sugars, being those described in consumption entry No. 164,820, all of which sugars were the product of the Philippine Islands, and these sugars were brought into the port of New York on the 13th day of October, 1899. On their arrival at the port of New York, the defendant, as such collector, and under color of his said office, and through the exercise of the power and authority in him vested for the purposes of the performance of his duties as such collector, and by duress of the said goods, demanded and collected from the plaintiff, as duties upon the said sugars, the sum of $58,027.49. The plaintiff, at the time the said goods were held, and the said sum of money was demanded and collected, formally and duly protested against the action of the said collector; but in order to obtain said goods the plaintiff was compelled by the defendant to pay, and did pay, on the 16th of October, 1899, the said sum of money.

The question is whether or not the said sugars were subject to the payment of any duty on their arrival at the port of New York, October 13, 1899, they having been shipped in the Philippine Islands on the 14th day of March, 1899, and, incidentally, was the Philippine Islands a foreign country, within the meaning of the tariff laws of the United States, at the time of the importation of said sugar?

The complaint describes with particularity the acts alleged to be illegal, and, if the acts described were not illegal, then all the allegations of the complaint characterizing them as such are of no avail, and the demurrer must be sustained.

The tariff act of July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626], provides:

"There shall be levied, collected and paid upon all articles imported from foreign countries, and mentioned in the schedules herein contained, the rates of duty which are by the schedules and paragraphs, respectively, prescribed."

In section 1, Schedule E, par. 209, of said act (30 Stat. 168 [U. S. Comp. St. 1901, p. 1647]), certain rates of duty are prescribed on sugar; and it is not claimed that the rates of duty imposed or collected are greater than warranted by the act, if the sugars were dutiable at all.

It is insisted by the defendant that at the time of the shipment of these sugars from Iloilo they were imported from a foreign country, within the meaning of the law, since the Philippine Islands did not cease to be a foreign country until April 11, 1899; and the defendant cites in support of this contention the case of Dooley v. U. S., 182 U. S. 222–230, 21 Sup. Ct. 762, 45 L. Ed. 1074; also Haver v. Yaker, 9 Wall. 32, 19 L. Ed. 571; Ex parte Ortiz (C. C.) 100 Fed. 962; Davis v. Parish of Concordia, 9 How. 280, 13 L. Ed. 138; Hylton v.

Brown, 1 Wash. C. C. 343, Fed. Cas. No. 6,982. The defendant also contends that when these goods were shipped from Iloilo to the United States they started as dutiable goods, and that the exportation ended when the steamer left the shores of Iloilo, March 14, 1899, and the importation then began, and was completed on the arrival of the goods at the port of New York, and that they were then subject to the duties with which they were burdened March 14, 1899, when the exportation ended and the importation commenced. The contention of the defendant rests upon the expression of Mr. Justice Brown in his opinion in De Lima v. Bidwell, 182 U. S. 1, 21 Sup. Ct. 743, 45 L. Ed. 1041, where, at page 180, 182 U. S., page 746, 21 Sup. Ct., 45 L. Ed. 1041, the learned justice said:

"Whether these cargoes of sugar were subject to duty depends solely upon the question whether Porto Rico was a 'foreign country' at the time the sugars were shipped, since the tariff act of July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626], commonly known as the 'Dingley Act,' declares that 'there shall be levied, collected and paid upon all articles imported from foreign countries' certain duties therein specified."

It is contended by the plaintiff that as these sugars were imported into the United States after the ratification of the treaty of Paris, and therefore after the Philippine Islands had ceased to be a foreign country, they were not subject to duty, and that the importation took place on their arrival in the United States, and not at the time they left the port of Iloilo. The plaintiff contends that the effect of the treaty of Paris was to repeal so much of the tariff act of July 24, 1897, as authorized the levy or collection of duty on these goods; and he contends that on October 13, 1899, when the merchandise in question reached the port of New York, the situation of the tariff laws with regard to these sugars was the same as if an act of Congress had then been in force by which all goods imported from the Philippines were on the free list. The plaintiff also contends that no article is imported from a foreign country until it has actually arrived within the limits of a port of entry, and cites U. S. v. Vowell, 5 Cranch, 368, 3 L. Ed. 128; Arnold v. U. S., 9 Cranch, 104, 3 L. Ed. 671. The plaintiff also contends that, in a case where the government of the United States is a party, a treaty is considered concluded and binding from the date of its signature, and that the exchange of ratifications has a retroactive effect, confirming the treaty from its date. In this case the treaty was signed at Paris December 10, 1898; ratification was advised by the Senate February 6, 1899; same was ratified by the President February 6, 1889, and by the Queen Regent of Spain March 19, 1899. The ratification was exchanged at Washington and there proclaimed on the 11th day of April, 1899. March 2, 1899, an act of Congress (Act March 2, 1899, c. 376, 30 Stat. 993), was approved by the President making an appropriation of $20,000,000 for the purpose of carrying out the obligations of the treaty between the United States and Spain; same to become immediately available on the exchange of the ratifications of said treaty. The Senate ratified the treaty, as did the President, prior to the shipment of the sugars in question, which occurred on the 14th of March, 1899, although the treaty was not ratified by the

Queen Regent of Spain until March 19, 1899, four days after the shipment of these sugars.

It is quite clear that the Philippine Islands was a foreign country at the time the sugars were shipped—at the time the exportation from the Philippine Islands ended and the importation into the United States commenced—but it is equally clear that the Philippine Islands had ceased to be a foreign country when these sugars arrived at the port of New York.

In United States v. Vowell and another, 5 Cranch, 368, 3 L. Ed. 128, it was held that duties upon goods imported do not accrue until their arrival at the port of entry, and that therefore the duty upon salt, which ceased with the 31st of December, 1807, was not chargeable upon a cargo which arrived within the collection district before that day, but did not arrive at the port of entry until the 1st of January, 1808. Marshall, C. J., delivered the opinion of the court, and said:

"The duties did not accrue, in the fiscal sense of the term, until the vessel arrived at the port of entry. * * * It is understood that in case of an increase of duty the United States have always demanded and received the additional duty if the goods have not arrived at the port of entry before the time fixed for the commencement of such additional duty, although the vessel may have arrived within the collection district before that time. The same rule of construction is to be observed when there is a diminution of duty."

Following the decision in this case, the logical conclusion is that where duties cease altogether, for any reason, before the arrival of the goods at the port of entry, no duty can be collected.

In Arnold et al. v. The U. S., 9 Cranch, 104, 3 L. Ed. 671, it was held that "to constitute an importation, so as to attach the right to duties, an arrival within the limits of some port of entry is necessary." The question in that case arose under the act of July 1, 1812, c. 112, 2 Stat. 768. That act provided "that an additional duty of 100 per cent. upon the permanent duties now imposed by law, etc.," shall be levied and collected upon all goods, wares and merchandises which shall, from and after the passing of this act, be imported into the United States from any foreign port or place." Story, J., in delivering the opinion of the court, said:

"It is further contended that the importation was complete by the arrival of the vessel within the jurisdictional limits of the United States on the 30th day of June. We have no difficulty in overruling this argument. To constitute an importation, so as to attach the right to duties, it is necessary not only that there should be an arrival within the limits of the United States, and of a collection district, but also within the limits of some port of entry. This was expressly decided in the case of the United States v. Vowell, 5 Cranch, 368, 3 L. Ed. 128."

The expression of Mr. Justice Brown in De Lima v. Bidwell, 182 U. S. 180, 21 Sup. Ct. 746, 45 L. Ed. 1041, "whether these cargoes of sugar were subject to duty depends solely upon the question whether Porto Rico was a foreign country at the time the sugars were shipped," etc., can hardly be regarded as overruling U. S. v. Vowell and Arnold v. U. S., supra. It was not necessary to the determination of the case in De Lima v. Bidwell to hold that the car-

goes of sugar there in question were imported into the United States, within the meaning of the tariff law, at the date when such sugars were shipped.

In Keck v. United States, 172 U. S. 434, 19 Sup. Ct. 254, 43 L. Ed. 505, Keck was indicted under section 2865 of the Revised Statutes [U. S. Comp. St. 1901, p. 1905], which is as follows:

"If any person shall knowingly and wilfully, with intent to defraud the revenue of the United States, smuggle, or clandestinely introduce, into the United States, any goods, wares or merchandise, subject to duty by law, and which should have been invoiced, without paying or accounting for the duty, * * * such person * * * shall be deemed guilty," etc.

The court held:

"The offense described in Revised Statutes, § 2865 [U. S. Comp. St. 1901, p. 1905], is not committed by an act done before the obligation to pay or account for the duties arises."

It was held that although when within the limits of the custom district the diamonds were concealed, etc., inasmuch as they were actually delivered to the customs authorities on arrival at the port of entry, no offense was committed. In that case, in the dissenting opinion by Mr. Justice Brown (Harlan and Brewer, JJ., concurring), we find this approval of the definition of "importation," or of the word "import" or "imported," viz.:

"In at least two cases in this court (United States v. Vowell, 5 Cranch, 368 [3 L. Ed. 128]; Arnold v. United States, 9 Cranch, 104 [3 L. Ed. 671]), an 'importation' to which the government's right to duty attaches was defined to be an arrival within the limits of some port of entry, or, as stated by Mr. Justice Curtis in United States v. Ten Thousand Cigars, 2 Curt. 436 [Fed. Cas. No. 16,450], 'an importation is complete when the goods are brought within the limits of a port of entry with the intention of unlading them there.' A similar definition of an importation is given in the following cases: Harrison v. Vose, 9 How. 372, 381 [13 L. Ed. 179]; United States v. Lyman, 1 Mason, 499 [Fed. Cas. No. 15,647]; McLean v. Hager (C. C.) 31 Fed. 602, 606; The Schooner Mary, 1 Gall. 206 [Fed. Cas. No. 9,183], wherein it was said by Mr. Justice Story that 'an importation is a voluntary arrival within some port with intent to unlade the cargo.' "

This language and the decisions in the cases cited seem to constitute a distinct approval of the doctrine enunciated in United States v. Vowell, supra.

In Hartranft v. Oliver, 125 U. S. 525, 8 Sup. Ct. 958, 31 L. Ed. 813, Mr. Justice Field, in giving the opinion of the court, said:

"As the vessel in which they were brought arrived at the port of Philadelphia and was entered at the customhouse on the 30th of June, 1883, they would be deemed imported on that day, so as to be subject to the duties thus prescribed, were it not for provisions in the act of March 3, 1883 [22 Stat. 489, c. 121], and the custody taken of the vessel and goods by an officer of the customhouse on the day of its arrival in port, and kept by him until after the 1st of July following. That act declared that on and after the 1st day of July, 1883, certain designated sections should be a substitute for title 33 of the Revised Statutes. * * * One of these sections provides that the duties on all preparations known as 'expressed oils,' not specifically enumerated or provided for in the act, shall be 25 per cent. ad valorem. * * * The plain meaning of this section is that, though goods are imported before the act takes effect, yet, if they are kept until after that period in a public store or bonded warehouse (that is, in the custody and under the

control of officers of the customs), they shall be subjected only to the duties thereafter leviable when they are entered for consumption."

It would seem from the opinion in this case that merchandise is to be deemed imported on the day when it arrives at the port of entry, and not before.

In Lawder v. Stone, 187 U. S., at page 283, 23 Sup. Ct. 80, 47 L. Ed. 178, this doctrine that "imported" means when the imported merchandise comes within the port is restated and approved. The opinion says:

"In Marriott v. Brune (1850) 9 How. 619 [13 L. Ed. 282], it was held that under the eleventh section of the tariff act of July 30, 1846 [Schedule B, c. 74, 9 Stat. 44], where a portion of a cargo of sugar and molasses was lost by leakage on the voyage to this country, duty should be exacted only upon the quantity of sugar and molasses which arrived here, and not upon the quantity which appeared to have been shipped. In the course of the opinion the court said (page 632 [9 How., page 288, 13 L. Ed.]): 'The general principle applicable to such a case would seem to be that revenue should be collected only from the quantity or weight which arrives here; that is, what is imported, for nothing is imported till it comes within the limits of a port. See cases cited in Harrison v. Vose, 9 How. 372 [13 L. Ed. 179]. And by express provision in all our revenue laws, duties are imposed only on imports from foreign countries, or the importation from them, or what is imported. 5 Stat. 548, 558, c. 270. The very act of 1846 under consideration imposes the duty on what is "imported from foreign countries." * * * The Constitution uses like language on this subject. Article 1, §§ 8, 9. Indeed, the general definition of customs confirms this view, for, says McCulloch (vol. 1, p. 548), "Customs are duties charged upon commodities on their being imported into or exported from a country." ' "

Is there any reason why it should be held that the goods, wares, and merchandise in question are to be deemed imported into the United States at the date of shipment, when they would not be deemed imported into the United States at that date, had the islands remained a foreign country, and had the tariff laws in force when the sugars were shipped been changed by either increasing or reducing the duties? Clearly not. The treaty-making power, the legislative branches of the government, and the executive all concurred in acts which ripened into a law, in effect, putting these sugars on the free list before they arrived at the port of New York. These acts of these various departments of the government, so far as the sugars in question were concerned, operated to repeal the Dingley tariff act imposing a duty thereon, or, rather, made that act inoperative as to such sugars; and, in the judgment of this court, no duty could lawfully be assessed or collected on their arrival at the port of entry.

The complaint states facts sufficient to constitute a cause of action against the defendant.

When the merchandise mentioned in the complaint was shipped from Iloilo, in the island of Panay, in the Philippine Islands, said islands was a foreign country, within the meaning of the tariff laws of the United States, but the said merchandise was not imported into the United States at the time when shipped, but at the time when such merchandise arrived at the port of New York, and at that time the Philippine Islands had ceased to be a foreign country, and had become property belonging to the United States; and, as Congress had not then acted and passed a law imposing a duty on merchandise

brought into the United States from the Philippine Islands, such sugars were not subject to any duty, and the collection of the duties in question was illegal.

The demurrer of the defendant must be overruled, with costs. So ordered.

