ARMSTRONG et al. v. BIDWELL, Collector.

(Circuit Court, S. D. New York. August 7, 1903.)

1. TREATIES—TIME OF TAKING EFFECT—EXCHANGE OF RATIFICATIONS.
   The exchange of ratifications of a treaty with a foreign government is an essential part of the transaction to render the treaty effective, since, until such exchange, which operates as a delivery, the treaty is inchoate and subject to be defeated by the action of either contracting party.

2. CUSTOMS DUTIES—DATE WHEN PORTO RICO CEASED TO BE FOREIGN COUNTRY —TAKING EFFECT OF TREATY.
   The treaty with Spain by which Porto Rico was ceded to the United States, although signed December 10, 1898, and ratified by Spain (which was the last to ratify) on March 19, 1899, did not become effective for the purposes of the tariff laws until the exchange of ratifications, April 11, 1899, and all importations of merchandise arriving from Porto Rico at a port of entry of the United States prior to that date were subject to duty. The doctrine of relation has no application to the taking effect of a treaty, so far as relates to its effect on individual rights.

Action to Recover Customs Duties Paid. On demurrer to complaint.

The defendant demurs to the complaint of the plaintiffs, which seeks to recover from the defendant, collector of the port of New York, the sum of $3,796.99, with interest from March 20, 1899, alleged to have been illegally exacted by the imposition of tariff duties upon 20 packages of sugar brought by the plaintiffs into the port of New York from the port of San Juan, island of Porto Rico, during the month of March, 1899, and which duties were im-

posed and collected on the 20th day of March, 1899. The grounds of the demurrer alleged are that the court has no jurisdiction of the alleged cause of action against the defendant, and that the complaint does not state facts sufficient to constitute a cause of action against said defendant.

Henry M. Ward (F. R. Coudert, Jr., and Paul Fuller, of counsel), for plaintiffs.

Henry L. Burnett, U. S. Atty., and Henry C. Platt, Asst. U. S. Atty., for defendant.

RAY, District Judge. The question raised by the demurrer in this case is, did Porto Rico cease to be a foreign country, within the meaning of the Dingley tariff act—the tariff act of July 24, 1897, c. 11, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1626]—which provides, "There shall be levied, collected and paid upon all articles imported from foreign countries, and mentioned in the schedules herein contained, the rates of duty which are by the schedules and paragraphs respectively prescribed" at the time when the treaty of peace between the United States and Spain was ratified by the respective parties thereto, or April 11, 1899, when the ratifications of said treaty were exchanged and said treaty was proclaimed.

The sugar in question was imported from Porto Rico and entered at the custom house in the port of New York on the 20th day of March, 1899. The plaintiffs duly protested against the payment of any duties, but the payment of $3,796.99 duties imposed under the said tariff act was enforced. Previous to August 12, 1898, the United States of America and the Kingdom of Spain were at war. A protocol was signed August 12, 1898. Spain evacuated the island from August 12 to December 10, 1898. A treaty of peace between the two powers was signed by their respective commissioners at Paris December 10, 1898. This treaty was ratified by the Senate of the United States and by the President February 6, 1899; and by the Queen Regent of Spain and Spanish Cortes March 19, 1899. The ratifications were exchanged and the treaty proclaimed April 11, 1899. As stated, the importation of these sugars was made March 20, 1899, the day after the Spanish government ratified the treaty, but about 20 days before the ratifications were exchanged and the treaty proclaimed.

The tariff law above referred to, known as the "Dingley Tariff Act," was in force, and duties on all merchandise imported into the United States from Porto Rico were legally collected, so long as Porto Rico remained a foreign country. Article 2, § 2, of the Constitution of the United States, provides that the President "shall have power by and with the advice and consent of the Senate to make treaties, provided two-thirds of the senators present concur." Article 6 provides, "This Constitution and the laws of the United States * * * and all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land."

The signing of this treaty between the United States and Spain, its ratification by the Senate and President, by the Queen Regent of Spain and Spanish Cortes, and the exchange of the ratifications on the 11th day of April, 1899, completed the peace between the two

governments, and operated to transfer the island of Porto Rico to the United States. The exchange of the ratifications was like the delivery of a deed, and until that was done the transaction was not complete, and Porto Rico did not cease to be a foreign country, within the meaning of the tariff laws. Until the ratifications were exchanged, it was competent for either power, or both, to recede and rescind its action. These acts—the signing, the ratification, and the exchange of the ratifications—operated as a repeal of the Dingley tariff act, so far as it applied to Porto Rico, or, more properly speaking, on the exchange of the ratifications that law ceased to be operative as to importations of merchandise into the United States from Porto Rico. Until that was done that law was in full force and effect, for the transaction was not complete which made Porto Rico property of the United States, and took that island from the jurisdiction of the Kingdom of Spain.

Assuming that a treaty is a contract between nations, and is subject to the same general rules of construction as are contracts between individuals, and that with respect to private rights it has the force of a law, and with respect to the rights of the nations, who are parties to it, it has the force of, and is to be construed as, a contract (U. S. v. D'Auterive, 10 How. 609–623, 13 L. Ed. 560, and U. S. v. Reynes, 9 How. 127–148, 13 L. Ed. 74), still no contract takes effect until delivery, and no law takes effect until it is finally signed and approved; and when a law is made by the action of two nations, whose action must concur to make it valid, it cannot be said that the law goes into full force and effect while anything remains to be done by the parties in order to make the action binding and final. Here the exchange of the ratifications was an essential part of the transaction. It is quite true that after the signing of a treaty of peace, in certain cases, and under the terms thereof, the officers of the respective governments may not have power to do many acts they would have power to do, had the treaty not been signed. During the pendency of action by the two governments matters are to remain in statu quo so far as possible.

It is said by the plaintiffs that, "after the treaty had been ratified by the Senate and by the President, it had been made. It was beyond recall. It had become an accomplished fact, as far as this government is concerned." With this contention this court does not agree. It was within the power of the Senate to rescind its action ratifying the treaty, and, had such action been taken by that body, it was within the power of the President to approve it. Again, Spain did not ratify the treaty until March 19, 1899, and who will contend that the treaty was binding or conclusive upon any one until that was done? And again, it was within the power of Spain to recede from her ratification of the treaty and refuse to exchange ratifications, in which case it will hardly be contended that the treaty took effect or bound either party.

It is contended that the ratification of this treaty related back to the date of its signing, so that with respect to all public rights the treaty took effect from its date. With this contention the court does not agree, in so far as it is sought to apply the proposition to this

case. While this treaty was ratified by the Senate and the President of the United States February 6, 1899, and by the Queen Regent of Spain and Spanish Cortes March 19, 1899, so that in some senses the treaty may be said to have been ratified March 19, 1899, still what is meant by ratification of the treaty, within the language of the Supreme Court of the United States in passing upon these questions, is shown by the language of that court in Dooley v. U. S., 182 U. S. 222, 21 Sup. Ct. 762, 45 L. Ed. 1074, page 230, 182 U. S., page 765, 21 Sup. Ct., 45 L. Ed. 1074, where Mr. Justice Brown, in giving the opinion of the court, says:

"In their legal aspect, the duties exacted in this case were of three classes: (1) The duties prescribed by General Miles under order of July 26, 1898, which merely extended the existing regulations; (2) the tariffs of August 19, 1898, and February 1, 1899, prescribed by the President, as Commander in Chief, which continued in effect until April 11, 1899, the date of the ratification of the treaty and the cession of the island to the United States; (3) from the ratification of the treaty to May 1, 1900, when the Foraker act took effect."

After reading this decision, and having this declaration of the Supreme Court in mind, we are not left in doubt as to the date of the ratification of the treaty and the cession of the island of Porto Rico to the United States. It is the duty of this court to follow that decision, or, more properly speaking, that declaration of that court as to the date of the ratification and cession of the island. On that day (April 11, 1899) Porto Rico passed from the Kingdom of Spain to the United States of America, and ceased to be a foreign country, or part of a foreign country. Until that date Porto Rico was a foreign country, and it was legal for the collector of the port of New York to impose duties on all merchandise brought into that port up to midnight April 10, 1899.

The plaintiffs in this case are not in a position to say that the treaty was fully ratified, complete, and operative, as to them, prior to the exchange of the ratifications by the two governments, whatever may be the rights of the two governments, as between themselves, prior to that date. It would seem to be well settled that a treaty is to be considered as concluded on the exchange of ratifications. Davis v. Parish of Concordia, 9 How. 280, 13 L. Ed. 138; Hylton v. Brown, 1 Wash. C. C. 343, Fed. Cas. No. 6,982; Haver v. Yaker, 9 Wall. 32, 19 L. Ed. 571; U. S. v. Arredondo, 6 Pet. 691, 8 L. Ed. 547; Holbrook v. U. S., 22 Law Rep. 226; Ex parte Ortiz (C. C.) 100 Fed. 962; Dooley v. U. S., 182 U. S. 222–234, 21 Sup. Ct. 762, 45 L. Ed. 1074; 2 Butler on Treaty-Making Power of U. S., §§ 382–383. Article 7 of the treaty provided in terms for the exchange of ratifications at Washington, and article 8 of the treaty provided that the exchange of ratifications was to be the time when each power, respectively, relinquished all claims for indemnity of every kind. It is impossible to give this treaty any retroactive effect, so far as the imposition and collection of duties upon merchandise imported from Porto Rico into the United States is concerned.

Attention has been called to an opinion by Somerville, General Appraiser, April 1, 1902, in Re Protest of J. Mendy (23,638 G. A. 5116), in which he holds that the Philippine Islands ceased to be a "foreign

country," within the meaning of the tariff laws, so soon as the treaty of peace between the United States and Spain was signed, and that all merchandise brought into the United States subsequent to such signing, December 10, 1898, were entitled to entry free of duty. As between Spain and the United States, the treaty was ratified on the exchange of ratifications, and, when such exchange had taken place, related back to the time of signing, for as between them the stipulations then made had reference to the then existing conditions. But this doctrine of relation does not apply to the importation of merchandise by private persons. The authority cited by General Appraiser Somerville says:

"A treaty is a written contract between sovereigns. Its terms are agreed upon, and it is signed by plenipotentiaries or commissioners who are the authorized agents of the contracting powers. But after such agreement and signature it must be ratified by the governments, and the exchange of ratifications constitutes the delivery. Up to that time it is inchoate, and may never take effect."

This being the law, how can it be said that the treaty between the United States and Spain had become a law, transferring the Philippine Islands and Porto Rico to the absolute sovereignty of the United States, prior to the exchange of the ratifications, the treaty itself stipulating that such an exchange should be made at the city of Washington? It was inchoate (an inchoate law), and might never take effect. So far as such a treaty affects private rights (and is not the importation of merchandise and the payment or nonpayment of duties thereon a private right), the treaty does not take effect until the exchange of ratifications. Haver v. Yaker, 9 Wall. 32, 19 L. Ed. 571. A long time may elapse before such exchange is made. In the meantime affairs go on irrespective of the terms of the treaty, and (as to private rights and interests) will not be disturbed by any application of the doctrine of relation. Ex parte Ortiz (C. C.) 100 Fed. 962.

It is difficult to comprehend how, reasonably, it can be contended that the importation of merchandise from either Porto Rico or the Philippine Islands into the United States by these plaintiffs was an affair or transaction between Spain and the United States. Such importation is strictly a private matter regulated by law, and carried on by the individual subject to the payment of import duties, if any, imposed by the government at the port of entry. This suit is based upon and directly affects the private rights of individuals. The suit is by private parties against Bidwell individually for alleged wrongful acts done by him. The very foundation of the alleged cause of action is that he failed to confine himself to a proper discharge of his duties, as collector, but exceeded his authority and committed a wrong for which he is personally liable. If a recovery is had, he is personally liable, and has no recourse against the United States until a certificate of probable cause is granted by the court, under section 989 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 708], and when such certificate is obtained the government assumes a certain liability. White v. Arthur (C. C.) 10 Fed. 80. That section reads as follows:

"Sec. 989. When a recovery is had in any suit or proceeding against a collector or other officer of the revenue for any act done by him, or for the recovery of any money exacted by or paid to him and by him paid into the Treasury, in the performance of his official duty, and the court certifies that there was probable cause for the act done by the collector or other officer, or that he acted under the directions of the Secretary of the Treasury, or other proper officer of the government, no execution shall issue against such collector or other officer, but the amount so recovered shall, upon final judgment, be provided for and paid out of the proper appropriation from the Treasury."

Under the decisions of the courts of the United States, which are uniform, it must be held that private rights are involved, and that the doctrine of relation does not apply. Dooley v. U. S., 182 U. S. 222–230, 21 Sup. Ct. 762, 45 L. Ed. 1074. The court said (page 230, 182 U. S., page 765, 21 Sup. Ct., 45 L. Ed. 1074):

"While it is true the treaty of peace was signed December 10, 1898, it did not take effect upon individual rights until there was an exchange of ratifications."

At pages 233, 234, 182 U. S., page 767, 21 Sup. Ct., 45 L. Ed. 1074, the court further said:

"Different considerations apply with respect to duties levied after the ratification of the treaty and the cession of the island to the United States. Porto Rico then ceased to be a foreign country, and we have just held, in De Lima v. Bidwell [21 Sup. Ct. 743, 45 L. Ed. 1041], the right of the collector to exact duties from that island ceased with the exchange of ratifications."

If the decision in that case is to be adhered to—and it ought to be—we have a date fixed by judicial decision of the Supreme Court when Porto Rico and the Philippine Islands legally ceased to be a foreign country, within the meaning of the tariff laws, and for duty purposes.

It is perhaps worthy of remark that the entry in this case was a consumption entry. The goods were not placed in bonded warehouse, but delivered, and the duties paid.

The complaint in this action does not state facts sufficient to constitute a cause of action, and the demurrer must be sustained, with costs. So ordered.