## I. LYNN ET AL. v. S. B. BURNETT.

Decided January 23, 1904.

**1.—Administrator's Deed Without Order of Court.**

A deed of a headright land certificate made by an administrator is not available as a defense in an action of trespass to try title for the land where no order of court authorizing the deed to be made, and no order of confirmation, is shown.

**2.—Adverse Prior Possession—Trespass to Try Title.**

Plaintiff's vendor had a pasture of 240,000 acres inclosed by a wire fence, except at one corner, where there was a gap of three miles, usually watched by a line rider to keep the cattle in and others out of the pasture. The pasture company, plaintiff's vendor, owned only about one-half the tracts in the pasture, and the owners of some of the other tracts were in possession of their lands or grazed cattle in the pasture. The pasture company had no other possession of the tract therein, which is here in controversy, consisting of 1226 acres, than resulted from its being in the pasture and grazed over by the company's cattle. Held, not such possession as would authorize the court, in an action of trespass to try title, to instruct a verdict for plaintiff on the ground of prior possession.

**3.—Same—Presumption from Possession Is Rebuttable.**

The presumption upon which is founded the rule that proof of prior possession of land is prima facie evidence of title and sufficient to warrant recovery against one without title, is a rebuttable presumption.

**4.—Same—Character of Possession.**

Such possession must be actual, and must be so clearly defined as to give the claimant the exclusive dominion over the property.

Appeal from the District Court of King. Tried below before Hon. J. M. Morgan.

*J. H. Lynn, Montgomery & Hughes,* and *L. W. Dalton,* for appellants.

*Hunter & Flood* and *J. H. Glasgow,* for appellee.

STEPHENS, ASSOCIATE JUSTICE.—The court instructed a verdict for appellee, who was plaintiff in the action, and to this the errors are assigned.

The land sued for is the Jeoffrey Brown survey of 1226 acres in King County, patented April 18, 1884, in the name of the heirs of Jeoffrey Brown, by virtue of headright certificate issued to J. J. Ward, administrator of the estate of Jeoffrey Brown May 21, 1842. Indorsed on this certificate was a transfer to Barnett Hicklin, as follows:

"The Republic of Texas, County of Red River. This is to certify that I, James J. Ward, administrator of the estate of Jeffry Brown, dec'd, do hereby transfer and do by these prests treansfer and convey unto Barnet Hicklin, his heir and assigns, the balance of land unlocated on the within certificate, which conveyance is ordered and decreed by order of the probate court of the aforesaid county.

"Given under my hand seal this 21st July, 1842.

"J. J. WARD [Seal.]

"Administrator.

"Test: J. W. Green, M. G. Hall.
"Examined and approved this the 2d day of December, A. D. 1853.
"W. Y. TODD, Dist. Judge."

The certificate seems to have been located by the widow of Barnett Hicklin, and, with the transfer indorsed, was filed in the General Land Office in the year 1859. The record is otherwise silent as to the existence or nonexistence of probate orders authorizing or confirming the purported sale of the certificate. It is also silent as to who were the heirs of Jeoffrey Brown. The evidence tended to show that J. L. Hicklin, who was an heir of Barnett Hicklin, and who held deeds from some of the other heirs, took actual possession of the land in dispute in the year 1887, and held such possession for several months, living in a "dugout" which he had made, but owing to ill health finally left and went down to Gainesville, where he died soon afterwards. When he took possession the land was within the limits of a large pasture used by the Louisville Land and Cattle Company, containing 240,000 acres or more, the company owning or claiming to own more than half thereof, and having all inclosed by a wire fence except at the southeast corner, where there was a gap about three miles wide, which extended from the time the fence was built in the year 1885 until the year 1888. The company had a large herd of cattle in the pasture and usually had a man to ride the line at this gap to keep its cattle in and other cattle out. Various other owners of lands in this pasture were suffered to reside therein and to use the pasture for grazing their own cattle, each in proportion to the number of acres owned or claimed by him, and in some instances in a much greater proportion. And some, it seems, enjoyed this privilege without owning any land, though it seems to have been the intention of the company not to allow this. The survey in controversy was not used or occupied by the cattle company or anyone else except as a part of the common grazing ground when Hicklin went into possession, and no objection seems to have been made to his being there, although the company was aware of both his possession and claim. Ed C. Baker next went into actual possession, claiming an undivided interest of 115 acres under duly recorded conveyances from the widow and one of the heirs of Jonathan Hicklin, a brother of J. L. Hicklin. His possession began in 1891 and continued till 1898, when he was ousted by a lessee of the cattle company, who held possession till the fall of that year, when he surrendered it to Baker's tenants, who then held possession till 1901, when Baker sold and conveyed to appellee, Burnett, the interest he had acquired from the widow and one of the heirs of Jonathan Hicklin, which fact was recited in the conveyance. Burnett had just purchased, in November preceding, all the holdings of the cattle company, including the land in controversy, and purchased the Baker interest because, as stated in his testimony, he was afraid Baker might hold by limitation the land he had fenced. The paper title of the cattle company consisted alone of a warranty

deed from R. H. Hannah and wife, E. J. Hannah, dated February 8, 1886, and filed for record and duly recorded February 15, 1886, in Baylor County, to which King was attached until it was organized in 1891, and that of Hannah and wife consisted alone of a tax deed to Mrs. R. H. Hannah, made by the Comptroller in pursuance of a sale made to her November 15, 1880, of an undivided interest of 600 acres of the land on account of taxes delinquent for the years 1878 and 1879, and a like tax deed to R. H. Hannah in pursuance of a sale of 626 acres made June 26, 1885, on account of taxes delinquent for 1883. However, the land sold June 26, 1885, was redeemed by J. L. Hicklin July 24, 1885, and the money paid to Hannah. Both of these tax deeds were filed for record and recorded the same day that the deed from Hannah and wife to the cattle company was filed for record and recorded, February 15, 1886. All taxes were paid by the cattle company from 1885 to 1890 inclusive, but when these payments were made was not shown. That is, it was not shown that the cattle company paid any taxes before it received its deed from Hannah and wife. Taxes for 1886 were also paid by J. L. Hicklin. From 1891 to 1900, inclusive, the taxes were paid by the cattle company, and the taxes since then by Burnett. Appellants, who were defendants below, all claimed undivided interests through conveyances from the heirs of Barnett Hicklin.

In instructing a verdict for appellee for all the land sued for the court must have assumed that appellants, who claimed only undivided interests and disclaimed as to the rest, had failed to show a valid transfer of the certificate to Barnett Hicklin, without which they had no title; and this conclusion seems to be sustained by the authorities. Tucker v. Murphy, 66 Texas, 355; Rogers v. Kennard, 54 Texas, 30.

The court must also have concluded that appellee had established his right to recover by conclusive proof of possession in his vendor, the cattle company, prior to that with which appellants were connected or by such proof of five years' adverse possession under deed or deeds duly recorded, etc., since he failed to trace his title to the sovereignty of the soil, or to show a superior title under a common source. Inasmuch as the first possession with which appellants were connected, which was that of a tenant in common in the person of J. L. Hicklin, had its inception as early as the year 1887, and inasmuch as the possession of Ed C. Baker in the year 1891, which was also that of a tenant in common inuring to their benefit, was such as to prevent limitation from further running, we need only consider the question of prior possession. In other words, if the evidence of possession in the cattle company prior to that of J. L. Hicklin was not such as to warrant the court in withdrawing that issue from the jury, clearly there was no such evidence of adverse possession—of a visible appropriation of the land—prior to the completion of the pasture fence in 1888, which was less than five years before Baker went into possession, as to warrant the court in withdrawing the issue of five years adverse possession from the jury, the evidence

34 Civ.—22

of possession on the part of the cattle company before Hicklin took possession being the same as it was after he took possession, unless the completion of the fence in 1888 made a material difference. As to the suggestion that the possession of Hicklin amounted to nothing because of its abandonment by him, it is sufficient to say that the evidence on this issue was by no means conclusive.

It has several times been held in this State that proof of prior possession of land is prima facie evidence of title and sufficient to warrant a recovery in trespass to try title against one entering without title. Watkins v. Smith, 91 Texas, 591, and the cases there cited; Lockett v. Glenn, 65 S. W. Rep., 482. The presumption that the possessor is the owner is, however, a rebuttable presumption, being a mere rule of evidence and not a rule of property. Watkins v. Smith, supra; Robertson v. Kirby, 25 Texas Civ. App., 432, 61 S. W. Rep., 967; Austin v. Espuela Land and Cattle Co., not yet reported, 2 Texas Law Journal, 114. Such possession must, of course, be actual, and must be so clearly defined as to give the claimant the exclusive dominion over the property. Page v. O'Brien, 36 Cal., 559. And before the judge is authorized to take the case from the jury the evidence must be conclusive, leaving no room for doubt as to the fact of actual possession. It is not enough that the evidence is without conflict in establishing the facts relied on to show actual possession, but these facts must themselves conclusively prove such possession. It is often the case that there is no dispute as to the circumstances offered in evidence to establish a given fact, such, for instance, as residence or actual settlement, and yet the proper inference to be drawn from these facts involves a difference of opinion and should be left in the first instance to the jury. The fact of actual possession belongs to this class. Of course a case might and often does arise in which the facts relied on to establish the main fact at issue would lead to but one conclusion, and in such case there would be nothing to submit to the jury.

Applying these principles to the facts of this case as stated above, we find little or no dispute as to the facts relied on to show that the cattle company, prior to all others, took actual possession of the 1226 acres of land in controversy, but we can not agree with appellee that these facts conclusively established the fact of actual possession. Not until Hicklin went on the ground, constructed a "dugout" and made it his abode was the land, if not fenced, ever visibly occupied, that is, "used or employed in an exclusive manner," as that word is defined. It is possible or even probable that the cattle of said company may have grazed upon, and its "cowboys" ridden over the land, but that was of little or no consequence. Unless, then, the claimed inclosure was such in 1887, when Hicklin took possession, as to constitute, undisputably, actual possession, the cattle company had none, or rather the court was not warranted in holding that it had. This inclosure consisted of a wire fence about sixty-eight miles long, which, it seems, was at no place nearer than about fifteen miles to the land in controversy, and was open

at both ends, that is, it lacked about a league of closing. Through this gap Hicklin could and may have passed to take possession of the land in dispute without ever knowing or suspecting that possession thereof was had or even claimed by another. He was allowed to remain in possession for several months and so long as he stayed there without objection from the cattle company, as were very many others who owned or claimed lands in the large territory partially inclosed by the fence, which was itself a circumstance to be considered by the jury in determining whether the company had or claimed possession. But it is insisted that the company had a line rider there to mind this "little three-mile gap," as appellee is pleased to term it, and that it was thus in effect closed. Without questioning that possession of land might be taken and held by such means, we think the proof that the company usually had a man to ride the line there to keep its cattle in and the cattle of others out failed to conclusively show either that the gap was thus in effect closed or that this was done for the purpose of holding possession of the land in controversy. Without further comment, we conclude that appellants were at least entitled to have the issue of prior possession go to the jury.

As to the contention of appellants that the possession of the cattle company should be referred to its tax title which it is claimed was void, we incline to the opinion that the law arising on the facts found in this record would not warrant us in so holding. If the company had possession in 1886 when it acquired the tax title, the evidence tended to show that this possession had its inception during the preceding year, before the tax title was acquired. Besides, in order to rebut the presumption of title arising from possession, it was incumbent on appellants to show affirmatively the facts rendering the tax sale a nullity. It is insisted, however, that the tax title was void on its face, but we need not now, and it will probably not be necessary to, on another trial, determine that question.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*